**INSURANCE COMPANY OF NORTH AMERICA and Establishment Imports Inc., Plaintiffs,**

v.

**S/S "ITALICA", her engines, tackle, boilers, etc., "Italia" S.p.A. Di Navigazione Italian Line, Italia Di Navigazione S.p.A., Defendants.**

**No. 79 Civ. 4071 (PNL).**

United States District Court, S.D. New York.

March 15, 1983.

Yorkston W. Grist, David L. Mazaroli, of counsel, New York City, for plaintiffs.

Michael D. Martocci, New York City, for defendants.

OPINION AND ORDER

LEVAL, District Judge.

Plaintiffs Insurance Company of North America ("INA") and Establishment Im-

ports Inc. ("Establishment") brought this action against S/S Italica, her engines, tackle, boilers, etc. and her owner Italia Di Navigazione S.p.A. ("Italia"), for damages due to the freezing of two cargoes of wine transported from Italy to the United States aboard the Italica. The case was tried before the court without a jury. I find for the plaintiffs. This opinion constitutes the court's findings of fact and conclusions of law.

Establishment contracted to purchase 575 cases of Italian wine from a supplier in Florence and 1100 cases from a supplier in San Gimignano, in each case FOB Livorno. The shipments were containerized and were separately delivered to the Italica at Livorno for shipment to New York. On January 17, 1979, Italia issued negotiable clean bills of lading for the shipments. Each bill of lading stated on its face that the shipment consisted of a certain number of cases of wine. The bills of lading also provided:

> All goods of perishable nature, when accepted, may be carried in ordinary cargo compartments, containers, vans or trailers and without special facilities or attention unless the shipper and carrier have made a special agreement and noted on the face of the Bill of Lading that there is such special arrangement that such perishable goods will be carried in ... heated ... or otherwise specially equipped compartment, container, van or trailer.

The Italica sailed from Livorno, made calls at several European ports and departed Cadiz on January 30, 1979 for the Atlantic crossing. Although there was unutilized stowage space available below deck, the two wine containers were stowed on deck.

The vessel arrived in New Jersey on February 7, 1979 and discharged the cargo of wine to a pier. The date of discharge is not in evidence. Bitter cold temperatures obtained in New Jersey from February 9 to February 18. On February 14, 1979, Establishment's trucker picked up the container of 575 cases and received from defendants' agent a clean trailer interchange receipt. The trucker transported the wine that same day to Establishment's Syosset warehouse. Inspection at the warehouse revealed that the wine had been damaged by freezing. Corks were pushed up; bottles were broken; and some cartons were frozen.

The other container of 1100 cases was detained at the pier by customs because of the shipper's delay in sending a bottling certificate. The certificate having arrived, Establishment's trucker took possession of that cargo on February 28, 1979 and transported it the same day to Establishment's Syosset warehouse. This wine was found to have been similarly damaged by freezing.

Establishment through J.F. Hillebrand Ltd. presented a claim to its insurer, plaintiff INA. Surveyor Leonard J. Rysdyk inspected the shipment for INA and confirmed that the wine was damaged by freezing and unfit for consumption. Italia was notified of the damage to the wine and was invited to survey the shipment, but did not do so. INA paid Establishment $10,190.15 for the damage to the 575 cases and $18,177.78 for the damage to the 1100 cases for a total of $28,367.93.

 I find that the wine was in good condition when received by Italia in Livorno. This finding is not based on Italia's issuance of clean bills of lading, since the cargo was containerized in a manner which prevented Italia from ascertaining its condition. *See Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 352 (2d Cir.1981). The finding is based rather on Italian temperature records taken at Florence and Livorno, the testimony of the shippers and the fact that the two shipments originated at different places.[1]

---

1. At trial, I reserved judgment on the admissibility of the Italian weather records offered by plaintiff. The records are certified by their custodian and by the Central Institute of Statistics, a department of the Italian government. The records do not bear a final certification attesting to the genuineness of the signature and official position of the persons who attested to the records' accuracy. Such a final certification is normally required by Rule 44(a)(2) of the Federal Rules of Civil Procedure. I find, however, that plaintiffs made diligent efforts to

I find also that when Establishment's trucker took the wine from the Newark pier, it was frozen and damaged.

No evidence was received of ocean temperatures during the crossing. The evidence of bitter cold temperatures from February 9 to February 18 tended to support an inference that the wine froze on the pier in this period.

Defendant seeks to avoid liability by contending that its responsibility to care for the cargo ended upon discharge by the Italica on or about February 7. It argues further, as to the 1100 case shipment, that Establishment was dilatory in taking delivery so that Italia is exonerated.

These contentions fail. I find that plaintiff has successfully proved defendant's liability.

■ The governing cases in this circuit establish clearly that upon landing the cargo into the custody of its stevedore, the carrier assumes the status of bailee and remains "liable for the cargo's safe delivery." *Leather's Best, Inc. v. The Mormaclynx,* 451 F.2d 800, 812 (2d Cir.1971); *David Crystal, Inc. v. Cunard S.S. Co.,* 339 F.2d 295, 298 (2d Cir.1964). Italia's obligations under the bill of lading, therefore, continued in effect after discharge from the vessel during a reasonable time until Establishment took delivery. *See Leather's Best, supra,* 451 F.2d at 807 n. 5; *Farrell Lines, Inc. v. Highlands Ins. Co.,* 696 F.2d 28 at 29 (2d Cir.1982) (per curiam) (carrier has duty to notify consignee of vessel's arrival and to protect cargo until consignee has a reasonable opportunity to remove it).

■ Nor is Italia's liability affected by the fact that Establishment did not call for the second container until February 28. Although it is true that the shipper's failure to obtain a proper bottling certificate delayed the consignee's ability to procure re-

lease from customs, the facts demonstrate that this delay was not the cause of the damage. In the first place, extreme cold lasted only until February 18, with two more days of moderate cold, after which temperatures rose above 32°. The expiration of eleven (or at the most thirteen) days after arrival was certainly not so unreasonable as to exonerate the carrier from its obligations. It is clear that the damage must have occurred during the extreme cold spell (or earlier) and was therefore not caused by unreasonable delay on the consignee's part. *See The Fabbri Co. Inc. v. Universal Shipping Co.,* 1969 AMC 1615, 1620 (S.D.N.Y.1969) (carrier that left cargo exposed to the weather on a pier for close to a month failed to properly deliver cargo and breached its duty to consignee). Furthermore the fact that the first container was similarly frozen upon delivery on February 14 suggests that the damage to the second container was probably done by the same date.

■ Plaintiff's proofs that the wine was delivered to the carrier in good condition but damaged prior to delivery within a reasonable time after discharge established a prima facie case. The burden then shifted to the carrier to offer proof that the damage occurred for some reason beyond its responsibility. *See Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d at 812. Defendant offered no such evidence and failed completely to rebut plaintiff's prima facie case. Defendant made no showing that it or its stevedore took reasonable precautions to protect the cargo from the obvious danger of the sub-zero temperatures. Plaintiffs are entitled to judgment.

*Damages*

■ The ordinary measure of damages in ocean cargo cases is "the difference between the fair market value of the cargo at destination in the condition in which it

obtain a final certification and that defendant had a reasonable opportunity to investigate the authenticity and accuracy of the documents which had been made available to defendant over a year before trial. This is an appropriate case in which to allow admission of foreign public records without final certification. *See*

Fed.R.Civ.P. 44(a)(2) ("If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the documents, the court may for good cause shown (i) admit an attested copy without final certification . . .").

would have arrived but for the carrier's fault and its market value in the condition in which by reason of such fault it did arrive." *Interstate Steel Corp. v. S.S. "Crystal Gem"*, 317 F.Supp. 112, 121 (S.D.N.Y.1970).

 Plaintiffs offered evidence that the two shipments, if delivered in good condition, would have had a market value of $14,029.61 for the cargo of 575 cases and $24,709.46 for the cargo of 1100 cases. They also concede that they recovered net salvage proceeds from disposition in the amount of $630.91. Defendants did not rebut plaintiffs' proofs of damage.

I find that plaintiffs are jointly entitled to recover from the defendants $38,108.15, the difference between the wine's value in good condition and its value as delivered by the defendants.[2] Of the $38,108.16, plaintiff INA shall receive $28,367.93, the amount it expended to reimburse Establishment for the insured portion of the loss, and Establishment is entitled to the balance.

Plaintiffs are awarded pre-judgment interest at the rate of 14% per annum.

SO ORDERED.

**2.** Defendants' argument that their liability is limited to $500 per container is without merit. Where, as here, the bill of lading lists the contents of the container as a specified number of packages of goods, the container is not considered the "package" for purposes of COG-SA's package limitation. *See, e.g., Mitsui & Co. Ltd. v. American Export Lines Inc.*, 636 F.2d 807, 821 (2d Cir.1981); *Smythgreyhound v. M/V "Eurygenes"*, 666 F.2d 746, 752–53 (2d Cir.1981).