**PHILIP MORRIS,**
**Plaintiff-Cross-Defendant-Appellee,**

**v.**

**AMERICAN SHIPPING CO., INC.,**
**Defendant-Appellant,**

**Maritime Terminal, Inc.,**
**Defendant-Cross-Plaintiff-Appellant,**

**M/V CRUZ DEL SUR,**
**Defendant-Appellant.**

**No. 83–5461.**

United States Court of Appeals,
Eleventh Circuit.

Dec. 10, 1984.

Rehearing and Rehearing En Banc
Denied Jan. 21, 1985.

Arthur Roth, Miami, Fla., for Maritime Terminal, Inc.

Thomas E. Fotopulos, Fowler, White, Gillen, Boggs, Villareal & Banker, Jacob J. Munch, Tampa, Fla., for American Shipping.

Smathers & Thompson, Christian D. Keedy, Miami, Fla., for Philip Morris.

Before FAY and VANCE, Circuit Judges, and MACMAHON *, District Judge.

PER CURIAM:

Appellants American Shipping Company ("American") and Maritime Terminals, Inc. ("Maritime") appeal the district court's finding of liability in favor of appellee Philip Morris Incorporated ("Philip Morris"). Two separate matters are raised by the appellants. American contends that the district court erred in concluding that

---

* Honorable Lloyd F. MacMahon, U.S. District Judge for the Southern District of New York, sitting by designation.

American was not entitled to limit its liability to $500 per package pursuant to 46 U.S.C. §§ 1300–1315, the Carriage of Goods by Sea Act ("COGSA"). We find that the COGSA limitations incorporated in American's bills of lading were inapplicable to the post-discharge period and American was unable to meet its burden of proof regarding when the cargo was damaged; consequently, the Harter Act, 46 U.S.C. §§ 190–196, controls the question of liability, and the decision of the district court is affirmed. Maritime contends that the district court erred in requiring the remission of certain storage costs to Philip Morris. We disagree, and the decision of the district court regarding this issue is likewise affirmed.

## I. BACKGROUND

This dispute arose as the result of damage sustained by a cargo of tobacco owned by Philip Morris. In 1979, Philip Morris had agreed to repurchase from its former franchisee Compania Columbiana de Tobaco, S.A. ("Coltabaco") certain material, consisting mostly of tobacco. In June and September of 1979, two Philip Morris employees inspected the material at the Coltabaco warehouses in Columbia and found no damage to the tobacco, but some damage to the hogshead staves.

In late September, 1979, American was contacted regarding the carriage of the cargo from Baranquilla to Miami. American's agent thereupon issued "clean" bills of lading, which represented that the cargo was not damaged. The cargo, however, was not loaded on to the CRUZ DEL SUR until December 3rd and 4th, 1979. At that time, Captain Navas, the master of the ship, observed some damage to the cargo, including signs of waterstaining. As a result, he registered a formal Master's Protest on December 5, 1979. The district court made a finding that except for the broken hogshead staves, the cargo was generally in

good condition in late September 1979, when last inspected by Philip Morris. Therefore, since this factual finding is not clearly erroneous, *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1228 (11th Cir.1983), we must accept the conclusion that the cargo was damaged between late September and the time when it was actually loaded on the CRUZ DEL SUR. During that period of time, the cargo was in the custody of American's agents.

The district court found that the cargo was not damaged any further during the voyage to Miami. Upon arrival in Miami, however, Maritime unloaded the cargo and stored it in its unprotected yard. The unloading was completed on December 12, 1979, but the cargo was not removed from Maritime's premises until mid-January, 1980. Between January 21 and 24, 1980 Central Truck Lines Cargo picked up the cargo and eventually transported it to Richmond, Virginia. The district court found that the cargo sustained additional damage while in Maritime's possession.

## II. THE LAW

### A. *American Shipping and the COGSA $500 Limit*

American contends that the district court erred in concluding that it was not entitled to limit its liability to $500 per package, pursuant to the provisions of COGSA. American's bill of lading extends the COGSA provisions to the entire period of time in which the cargo is in the custody of the carrier. The district court held, however, that the COGSA provisions were not applicable to the period of time after the cargo was unloaded in Miami and American had not met its burden of proof regarding when the cargo was damaged.[1] We agree. Under these particular circumstances, the Harter Act controls, and American is liable for the total amount of damages sustained while the cargo was in its custody.[2]

---

1. Philip Morris argued that the $500 per package limitation was denied to American because it fraudulently misrepresented the condition of the cargo when it was received. There is no

finding, however, by the district judge to support this assertion by Philip Morris.

2. At oral argument, Philip Morris made two additional arguments in support of the result

By its terms, COGSA applies to the carrier only "in relation to the loading, handling, stowage, carriage, custody, care and discharge of" goods, and not to those periods unrelated to loading and unloading. 46 U.S.C. § 1302. The Harter Act applies to the entire period of the contract of carriage, except for those periods covered by COGSA. 46 U.S.C. § 1311. In effect, then, the Harter Act applies to those extended periods of time before and after the loading of the cargo on and off the vessel. The parties may agree to extend the COGSA limitation provisions to cover the entire period of time in which the carrier has custody of the cargo. 46 U.S.C. § 1307. *See Brown & Root, Inc. v. M/V Peisander,* 648 F.2d 415, 420 (5th Cir.1981); *Baker Oil Tools, Inc. v. Delta Steamship Lines,* 562 F.2d 938, 940 n. 3 (5th Cir.1977), *modified,* 571 F.2d 978 (1978). However, such stipulations limiting the carrier's liability under the Harter Act will be strictly construed against the carrier. *Cabot Corp. v. S.S. Mormacscan,* 441 F.2d 476, 478 (2d Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971). The carrier in the instant case included the following language in the terms and conditions of the bill of lading:

> The provisions stated in said Act [COGSA] shall ... govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier.

Despite this language extending the liability limitations of COGSA, the district court held that the COGSA limitations were inapplicable to the post-discharge period.

To establish a prima facie case of liability against the carrier, the shipper must show that the cargo was received in good condition by the carrier and the cargo was unloaded at its destination in a damaged condition. *Blasser Brothers v. Northern Pan-American Line,* 628 F.2d

376, 381 (5th Cir.1980). *Accord, Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1227 (11th Cir.1983). A clean bill of lading is prima facie evidence that the carrier received the cargo in good condition. *Blasser,* 628 F.2d at 381. Philip Morris has clearly established a prima facie case here. A clean bill of lading was issued by American, and there was no finding by the district court that the bill of lading was issued with an intent to misrepresent the condition of the cargo. As the trial court correctly concluded, American's proffered evidence of the damaged cargo—the Master's Protest—was not relevant to the question of the condition of the cargo when received by American's agents, but rather was relevant to the condition of the cargo in December, 1979, when it was loaded on to the CRUZ DEL SUR. Therefore, the cargo sustained some damage between the time that the cargo was received by American's agents in late September and December when the cargo was finally loaded on to the ship.

Once the shipper has established a prima facie case, the burden of proof shifts to the carrier to prove that the loss or damage falls within one of the COGSA exceptions or that the carrier exercised due diligence in preventing damage to the cargo. *Terman Foods,* 707 F.2d at 1227. *Cf. Maggard Truck Line v. Deaton, Inc.,* 573 F.Supp. 1388, 1394 (N.D.Ga.1983) (once prima facie case is established, carrier must show that it was both free from negligence and that the damage was due to an excepted cause). There were no findings by the district court as to the existence of any applicable exceptions.

The district court properly found that delivery by American to Philip Morris was not effected until the cargo was picked up by Central Truck Lines on January 21, 1980. Limitations on the carrier's liability are inapplicable if damage occurs due to negligence in the proper delivery of the

---

reached by the district judge: first, that deviation by American results in the avoidance of the COGSA limitations, and second, that lack of reasonable notice by American to Philip Morris regarding the latter's choice of a higher or lower

liability provisions also results in the avoidance of the COGSA limitations. There were no findings of fact made on these two points, and therefore, without anything to base them on, we are unable to draw any conclusions of law.

cargo. *F.J. Walker Ltd. v. M.V. "Lemoncore"*, 561 F.2d 1138, 1143 (5th Cir.1977). "Mere delivery to a wharf is insufficient." *Id.* Proper delivery occurs when the carrier places the cargo upon a fit wharf. *Id.; Goya Foods, Inc. v. S.S. Italica*, 561 F.Supp. 1077, 1085 (S.D.N.Y.1983). To determine whether a wharf is "fit", the court looks to the custom and usage of the port. *F.J. Walker*, 561 F.2d at 1144. In the instant case, the district court expressly found that Maritime, as American's agent, had not stored the cargo in a warehouse from the time it was unloaded to the time it was picked up on January 21; this was contrary to the custom and practice in the Port of Miami. Because the cargo was not properly delivered to a fit wharf, the Harter Act, not the limitation provisions contained in the bills of lading, controls the question of liability. *See Goya Foods*, 561 F.Supp. at 1085.

■ With regard to the lengthy period of time which elapsed between discharge and procurement of the cargo, the district court noted the late arrival of the bills of lading in Philip Morris' offices. Though it was unclear when copies of them were received, the court found that the original bills of lading were not received until December 28, 1979. Without those bills of lading, Philip Morris was unable to clear the cargo through customs. Thus, Philip Morris could not have picked up its cargo until at least this time, even if it had been aware of the damage sustained by the cargo. And, of course, the bills of lading did not reflect any damage to the cargo. Moreover, the delay in the procurement of the cargo was not the cause of the damage. *See Insurance Co. of North America v. S/S "Italica"*, 567 F.Supp. 59 (S.D.N.Y.1983). The district court found that much of the damage was caused by the inadequate storage provided by American's agent. As the district court stated, "American was negligent in allowing the cargo to be stored unprotected from moisture." (R.Vol. 1 at 318).

Therefore, we affirm the district court's conclusion that the COGSA limitations incorporated in American's bills of lading were not applicable to the period of time after the cargo was unloaded in Miami.[3]

■ Furthermore, the district court found that American did not exercise due diligence to prevent damage to the cargo after it was received by American's agents in Columbia and prior to the time it was loaded on to the ship. Because American was unable to separate what damage occurred during the pre-loading period when the COGSA limitations may have been applicable from the damage which occurred during the post-discharge period when the COGSA limitations were not applicable, it failed to sustain its burden of proof. Failing in its burden of proof, American was chargeable with the entire loss. *See Blasser*, 628 F.2d at 382; *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 105 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). *See also EAC Timberlane v. Pisces, Ltd.*, 580 F.Supp. 99, 115 (D.P.R.1983) ("If after all the evidence is presented the carrier leaves doubts as to the cause of the damage, they must be resolved against it.").

To permit American the benefit of the $500 limitation, despite the finding of the district court that American did not exercise due diligence in preventing damage to the cargo, both before it was loaded on to the CRUZ DEL SUR and after it arrived in Miami, would immunize the carrier from the adverse consequences of the negligent handling of cargo. *Cf. Nemeth v. General Steamship Corp.*, 694 F.2d 609, 613 (9th Cir.1982) ("To hold [the] liability limitation is absolute, regardless of the carrier's actions, would permit a carrier to violate the terms of the bill of lading at will, knowing that its liability will be limited to $500 per package."). The district court's award of damages to Philip Morris is AFFIRMED.

---

**3.** We note additionally that because of the strict construction placed upon limitations of liability in bills of lading, *see Cabot*, 441 F.2d at 478, we express some doubt as to whether the limitation provision here would extend over the extraordinarily long period of time in which the cargo was in the custody of the carrier's agent.

### B. *Maritime and the Storage Costs*

Maritime contends that the district court erred in ordering it to remit the excessive storage charges Philip Morris was forced to pay. The district court held that "Maritime *fraudulently* obtained payment of storage charges in the amount of $11,688.98 by representing that charges in excess of $20,000 were owed and by failing to disclose that the actual storage charges due were only $935 according to the terms of American's tariff." (emphasis added). (R.Vol. 1 at 296). As the district court correctly stated, 46 U.S.C. § 820, and the rules promulgated thereto, require that any person engaged in the business of "furnishing wharfage, dock, warehouse or other terminal facilities" must file terminal tariffs with the Federal Maritime Commission ("FMC"). 46 CFR § 533.3 (1983). The district court specifically found that Maritime acted as the terminal operator for the handling and storage of the cargo at issue here. There was no dispute over the fact that Maritime had never filed the required tariff. Due to Maritime's failure to comply with the law and the fact that Maritime acted as American's agent in the disposition of this cargo,[4] we agree with the district court that Maritime is therefore subject to the rates contained in American's tariff, which was properly filed with the FMC.

### C. *Frivolous Appeals and Attorney's Fees*

Philip Morris asserts that it is owed attorney's fees, pursuant to a Florida statute which allows the prevailing party to recover attorney's fees when the court finds "there was a complete absence of justiciable issue of either law or fact raised by the losing party." Fla.Stat.Ann. § 57.105. We conclude that Philip Morris is not entitled to attorney's fees for several reasons. In the first place, a serious question exists as to whether this Florida statute can even be invoked, as this is an admiralty case and not a diversity case where the

federal court sits as a state court and applies state law. *Blasser*, 628 F.2d 376, upon which appellee relies, is inapposite, as the statute in *Blasser* had been specifically held to be applicable in federal courts. *See Coblentz v. American Surety Co.*, 421 F.2d 187, 188 (5th Cir.1969).

Moreover, even if the Florida statute was applicable, the issues contested at bar are undoubtedly not frivolous. The case law construing the Florida statute suggests that parties claiming entitlement to attorney's fees must meet a very high standard. *See, e.g., Fireman's Fund Insurance Cos. v. Rojas*, 447 So.2d 1023 (Fla.Dist.Ct.App. 1984); *Ferm v. Saba*, 444 So.2d 976, 977 (Fla.Dist.Ct.App.1983) ("An award of fees ... is proper only where the action is so clearly devoid of merit both on the facts and the law as to be completely untenable."). That standard was not met here. Philip Morris' request for attorney's fees is DENIED.

---

4. At oral argument, Maritime's attorney conceded that the cargo was taken off the ship by Maritime, as agent for American.