**ITALUSA CORPORATION, PARMA-LAT, S.p.A., and New Hampshire Insurance Company, Plaintiffs,**

v.

**M/V THALASSINI KYRA, her engines, boilers, etc., and Compania Naviera Garoufalia, S.A., Compania Transatlantica Espanola, S.A., Defendants.**

**No. 85 Civ. 6167 (JES).**

United States District Court, S.D. New York.

March 21, 1990.

DeOrchis & Partners, New York City, for plaintiffs; Vincent M. DeOrchis and Diane M. Rollo, of counsel.

Walker & Corsa, New York City, for defendant Compania Transatlantica Espanola, S.A.; Christopher H. Mansuy and Michael T. Spallino, of counsel.

SPRIZZO, District Judge:

In this action, plaintiffs, Italusa Corporation, Parmalat, S.p.A., and New Hampshire

Insurance Company, seek damages for heat damage to a cargo of 466 cartons of Pecorino Romano cheese transported from Leghorn, Italy to New York by Compania Transatlantica Espanola, S.A. ("Spanish Lines").[1] Jurisdiction is based on 28 U.S.C. § 1333(1). The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

### FACTS

Italusa is a wholly-owned New Jersey subsidiary of Parmalat, an Italian general food products company. *See* Deposition of Roger Peroni ("Peroni Dep."), Plaintiffs' Exhibit ("PX") 44, at 4, 6. In 1984, Italusa imported several shipments of first quality export Pecorino Romano cheese from Leghorn in unrefrigerated containers. Trial Transcript ("Tr.") at 13, 42–43. Pecorino Romano is a grade of cheese made from sheep's milk usually used as a grating cheese. *Id.* at 42, 100. When the cheese arrived in the United States, Italusa's general practice was to place it in refrigerator units, either at Italusa's warehouse in Lodi, New Jersey or in a public warehouse. *Id.* at 43–44, 81.[2] Cheese is generally not shipped in July or August because of the

production rotation, and generally not in June because it is too hot. *See* Peroni Dep. at 64–66.

In March 1984, Roger Peroni, president of Italusa, received an order for one container of Pecorino Romano first quality export for a price of about $1.17 per pound. *Id.* at 25–26. Peroni in turn placed an order with Parmalat for a shipment of cheese to arrive in April. *See id.* at 29.[3]

It was Parmalat's usual practice to have all shipments of cheese inspected in Parma, Italy, to see if it was in accord with Parmalat's standard specifications. *See id.* at 10, 16–17. In addition, the cheese was also inspected by an Italian governmental body which controls the export of such goods and ascertains the quality of the goods for export, based upon such factors as appearance, consistency, aroma and flavor.[4] *See* Tr. at 383–85; Peroni Dep. at 11–14; PX 13, 94. For example, Italian law prohibited the exportation of irregular wheels with signs of heating. PX 94. Both inspections found the cheese proper for export, although neither contained an analysis of the cheese's moisture or fat content, age, or melting point. *See* PX 10, 13. The container of cheese was then booked for carriage to New York[5] and was received by

1. Defendants M/V Thalassini Kyra and Compania Naviera Garoufalia, S.A. were dismissed from this action by stipulation and order of voluntary discontinuance dated June 25, 1987. *See also* Trial Transcript ("Tr.") at 10.

2. Italusa's president stated that cheese is stored in the Italusa warehouse at approximately 48 to 50 degrees Farenheit. *See* Peroni Dep. at 6, 58–59.

3. Italusa's practice was to pay Parmalat for cheese by transferring money between banks, in this case $64,047.18, if the cheese was acceptable. Peroni Dep. at 36, 92. However, on this shipment, Parmalat was not paid and Italusa's account was credited. *Id.* at 38–39.

4. The document of inspection from the Instituto Nazionale Per Il Commercio Estero of Rome ("ICE") was admitted into evidence. PX 13 & 13A; *see* Tr. at 381–386. An apostille from the Italian government is affixed to the document, and Peroni testified that ICE is the governmental agency charged with the responsibility of inspecting samples of the shipment for quality. PX 13 & 13A; *see* Tr. at 381–86.

Although it is not entirely clear that the ICE document was sufficiently authenticated to warrant its admissability, *but see* Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, October 15, 1981, arts. 3 & 4, T.I.A.S. No. 10072, 527 U.N.T.S. 189 (apostille satisfies certification of authenticity), Fed. R.Civ.P. 44(a)(2) provides that "[i]f reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the documents, the court may, for good cause shown, (i) admit an attested copy without final certification." Here, since a copy of the document was given to defendant's attorney well in advance of trial, *see* PX 66, and Spanish Lines did not make a timely specific objection to the document's authenticity, the Court may properly consider this document. *See Insurance Co. of N. Am. v. S/S Italica,* 567 F.Supp. 59, 61 n. 1 (S.D.N.Y.1983); Tr. at 381–86.

5. The parties have referred to the destination of the cheese as New York when in fact the cheese was to be discharged at Port Newark, New Jersey. Because neither party has indicated to the contrary, it is reasonable to conclude that New York as used in this case encompasses Port Newark.

Spanish Lines on April 20, 1984. *See* Tr. at 439; PX 14.

Spanish Lines United States service is divided into two sections, the East Coast service and the Gulf of Mexico service. *See* Tr. at 431; Deposition of Juan Loredo ("Loredo Dep."), PX 7, at 25–26. In April, because the vessel Merced II had engine problems and was not ready for its intended voyage to the Gulf ports, *see* Loredo Dep. at 57–58, the Thalassini Kyra was chartered to perform the service to the Gulf in addition to being used to provide service to the East Coast. *Id.; see* Tr. at 433. As a consequence, cargo bound for New York, including the cheese at issue, was unloaded in New York after the Thalassini Kyra's last call in New Orleans. Loredo Dep. at 57–58; *see* Tr. at 433. If the Merced II had not broken down, the cheese would have been loaded on the Thalassini Kyra to go to New York without intermediary calls in the Gulf. Loredo Dep. at 63.

The usual rotation for Spanish Lines East Coast Service was Norfolk, Baltimore and New York, although Loredo testified that other Spanish Lines vessels have gone to Gulf ports and New York in the same rotation. *Id.* at 60, 62–63. The next Spanish Lines vessel sailing directly for New York and the East Coast was the Guadalupe, which left on May 12 from Leghorn and arrived in New York on May 29, two days earlier than the Thalassini Kyra. *Id.* at 59.

On April 28, Spanish Lines published an advertisement separately listing the Thalassini Kyra as calling at Gulf Ports and as calling at New York, *see* DX M at 7, although that advertisement did not indicate that the rotation would be to the Gulf first and then to New York.[6] *See id.* The May 3 issue of the Journal of Commerce[7] also listed a Spanish Lines vessel to be named which would leave for New York on May 4,

although it did not list any Gulf ports. PX 97B at 7; *see* Tr. at 450.

The container of cheese at issue was loaded at some time prior to sailing on May 3. Since the loading agent for the vessel is not ordinarily given any information with respect to the nature of cargo to be loaded unless it is dangerous or needs special care, it is reasonable to infer that he did not know that the container held cheese. *See* Deposition of Roman Murillo Gil ("Murillo Dep."), PX 8, at 18–20, 23–24. Moreover, the loading agent testified that he was unaware of the contents of the container. *Id.* Furthermore, Spanish Lines never gave its loading agents instructions not to accept cheese of this type in unrefrigerated containers because it was considered perishable but not a delicate cargo, although an evidently damaged cargo would be rejected. *See* Loredo Dep. at 35, 37. The container was placed below deck, in the hatch close to the engine room. *See* Murillo Dep. at 30–32.

Omnitrans Corporation, the correspondent in the United States for Parmalat's freight forwarder, was informed of two shipments of Pecorino Romano cheese, one which left May 3 on the Thalassini Kyra and another which left May 4 on the Ro Ro Genoa. Tr. at 344–45. Since the expected arrival date was two weeks from departure from Italy, Omnitrans, using the May 3 issue of the Journal of Commerce as a reference, expected arrival of the Thalassini Kyra on May 17. *Id.* at 345–47; PX 97B at 7.

The Ro Ro Genoa's shipment, also sent in an unrefrigerated container, arrived on May 20 without exterior damage.[8] *See* Tr. at 73–77. However, the Thalassini Kyra arrived at San Juan on May 17, and then made stops at Miami, Houston and New Orleans before proceeding to New York. *See* PX 6 (ship's log); *see also* Defendant's

---

6. The Spanish Lines documentation clerk testified that the geographic listing must be separate in the ads. Tr. at 445–46.

7. What was referred to at trial as the Journal of Commerce was actually entitled "L'Avvisatore Marittimo." *See* PX 97B.

8. Peroni had no explanation why the price of the cheese on the Ro Ro Genoa was about 20 cents more per kilogram than the cheese at issue here. *See* Tr. at 378–79. However, he did testify that different types of packaging may have been used, such as aluminum foil, cryovac or a vacuum plastic container at an increased cost. Peroni Dep. at 20–21.

Exhibit ("DX") V. At those ports and on the ocean, the vessel arguably encountered temperatures ranging from between 67 and 89 degrees Farenheit. *See* PX 3; DX V; *see also infra* p. 213.

Italusa's operations manager, Anthony Giordano, received information that the vessel would be arriving the last week of May, Tr. at 49, and, in fact, the vessel arrived at Port Newark on May 31 and completed discharge on June 1. *See* Pre-Trial Order at ¶ i; PX 6. The high temperatures in New Jersey from May 31 to June 3 were 63, 73, 76, and 67 degrees. *See* PX 4 at 1, 5. A heat wave, however, was experienced in New Jersey beginning on June 4, resulting in temperatures of up to 97 degrees. *Id.* at 5.

Plaintiffs' expert stated that the melting point of butterfat ranges from 80.6 to 96.8 degrees, and he estimated that butterfat would begin to run out of this cheese at 83 to 85 degrees. Tr. at 251–52, 269. However, he acknowledged that he did not know the specific melting point of the butterfat in this cheese, *id.* at 269, 271; that it would take some time for the heat to affect the cheese because the outer cartons of cheese would insulate the inner cartons, *id.* at 253, 288; and that the higher the temperature, the more severe the consequences to the cheese. *Id.* at 307–08. Nevertheless, it was his opinion that the butterfat began to run during the voyage and prior to the heat wave on June 4. *Id.* at 251–57. However, the validity of this opinion was weakened by the circumstance that it was based upon an exhibit which provided only average monthly high and low temperatures over a period of years, not the actual high and low temperatures encountered during the particular voyage at issue. *See id.* at 258–60, 466–470; DX V.

Plaintiffs' expert also stated that Pecorino Romano cheese was normally shipped from Italy to the United States in unrefrig-

erated containers, that the risk of heat damage in warm temperatures was known to the shippers, *see* Tr. at 322–23, and that a judgment would have to be made whether to use refrigerated containers even if a ship were going directly to the Atlantic coast in May, because that was a "gray area." *Id.* at 324–26.

After the Thalassini Kyra's arrival in New York, the cheese was discharged at Port Newark into shed 220 which did not have refrigeration facilities. *See* Tr. at 388–89. As noted above, the New Jersey heat wave began on June 4, and from that date until Italusa picked up the cheese, maximum daily temperatures were 86, 87, 89, 95, and 97, with an average temperature of 86. *See* PX 4 at 5.

A United States Customs permit was issued on June 6 and the earliest date that delivery of cargo could have been taken was June 7.[9] *See* Tr. at 354. Arrangements were made to send a truck on Friday afternoon, June 8. *Id.* at 122–23. The truck receipt for the delivery did not list an oily condition, which is not unusual because the truck driver is concerned only with damage to the container, not the condition of the cargo contained therein. *See id.* at 153–54.

The container was brought to the Marschall Warehouse, and when Giordano arrived at the warehouse that afternoon, oil was pouring out of the container. *Id.* at 50–51. When the container door was opened, oil poured from the length of the container in a continuous flow. *Id.* at 53, 93. The boxes were saturated with oil, and some boxes appeared to be falling apart. *Id.* at 53, 125–26. When a Marschall employee tried to pick up one oil soaked carton, a wheel of cheese fell out. *Id.* at 126. The odor of the cheese was described as heavy and pungent or rotten and spoiled. *Id.* at 53–54, 141. As a consequence, Gior-

---

**9.** During Customs clearance, a further delay was encountered because Customs officials believed that this shipment required a live entry, in which the actual entry documents must be given to Customs, the fee must be paid immediately and inspection of documents may cause a delay in clearance of two or three days. *See* Tr.

at 352–57, 364–367. In comparison, under an immediate delivery or ID entry, the shipper receives a grace period of ten days for the payment of duties and there is no delay in the entry of the goods. *See id.; see also* 19 C.F.R. 142.21 *et seq.*

dano refused to sign for the cheese. *Id.* at 114–15.

Marschall would not accept the cheese into their refrigerator unit for fear that it would contaminate the other products contained therein. *See id.* at 127. In addition, Marschall's general manager believed that unloading the container would be dangerous because of the heat and the condition of the packages. *Id.* Thereafter, Giordano made unsuccessful efforts to locate another refrigerated storage space, and later placed dry ice throughout the container. *See id.* at 59–60, 82–85. Moreover, Italusa's refrigerator space was full at this time, *see id.* at 87; Peroni Dep. at 48, and transfer of the cheese would have been difficult because of the condition of the shipment. *See* Peroni Dep. at 53–54.

On June 12, Arthur Lane, a marine surveyor, examined the cargo. PX 36; Tr. at 161, 163. He found pools of oil collecting around the container doors and around the container. PX 36; *see* Tr. at 165. On opening the container, he saw that butterfat had stained the cartons and was dripping to the ground. Tr. at 166. The wheels of cheese were misshapen to varying degrees. *Id.* at 186–89. The cheese was soft, melting, dripping butterfat and giving off a pungent odor. *Id.* at 169. He estimated that the temperature outside the container was 90 degrees and that inside the container the temperature was 10 to 15 degrees higher. *Id.* at 168. Lane also stated that the normal carriage temperature for cheese is 35 to 40 degrees, which would require refrigeration. *Id.* at 191–93. Accordingly, Lane recommended to Giordano that the cheese be refrigerated. *Id.* at 178.

Kaare Hansen, another marine and cargo surveyor, also examined the cheese on June 12. *Id.* at 406–08. He smelled a butterfat odor which dissipated over time. *Id.* The cheese was covered with an oily coating and there was some melting on the outer turn of the cheese. *Id.* at 409. In addition, butterfat oil was leaking out of the floor board of the container. *Id.* at 415. He recommended refrigerating and repacking the cheese, concluding that it had been exposed to high temperatures for some time. *Id.* at 410, 413.

Lane brought a sample of the cheese to the Fitelson Laboratories. *Id.* at 175. The laboratory reported to Lane by telephone on June 18 and in writing on June 26 that the cheese was fit to eat. *Id.* at 176.[10] After receiving the reports, Lane continued to recommend refrigeration. *See id.* at 202.

On June 15, Margaret Navitski, a representative from the New Jersey Department of Health, inspected the cheese. *See* Deposition of Margaret Navitski ("Navitski Dep."), PX 9, at 2, 20. She observed oil soaked containers of cheese as well as oil inside and on the pavement around the trailer and she also examined several individual wheels of cheese. *Id.* at 22, 24, 52, 65. As a consequence of her inspection, an embargo was placed on the shipment for suspicion of adulteration and misbranding, and the container could not be moved or opened without permission. *Id.* at 27, 29. Navitski returned to take samples of the cheese on June 20, and removed two wheels of cheese. *Id.* at 35–36.

The Department of Health's analysis revealed the formation of a mold in the cheese, which is considered to be an adulterant pursuant to New Jersey law. Tr. at 213, 215–16. The analysis also found a butterfat content of 26.9% which is below the federal standard of 38%, *see* 21 C.F.R. § 133.183, which permits the cheese to be considered misbranded pursuant to New Jersey law. *See* Tr. at 217–18. No petition was made to lift the embargo, *see id.* at 233; Navitski Dep. at 43–44, and in August, the cheese was destroyed on authorization of the New Jersey Department of Health with Italusa's consent. Tr. at 135–37, 145; Navitski Dep. at 45.

## DISCUSSION

■■■ Under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300

---

**10.** The moisture content was found to be 31.10%; fat on an as is basis, 28.15%, and fat on a dried basis, 40.86%. DX C; *see* Tr. at 176.

The laboratory prepared a report using the methodology of the Association of Official Analytic Chemists. Tr. at 460.

*et seq.* (1982 & Supp. V 1987), plaintiffs have the burden of proving that the goods were damaged while in the carrier's custody. *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351 (2d Cir.1981) (quoting *Pan–Am. Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871 (S.D.N.Y.1921)). Plaintiffs may establish a prima facie case by proving delivery of the goods to the carrier in good condition and outturn by the carrier of the same goods in a damaged condition. *Id.* at 352; *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

■ Where, as here, the cause of the damage may have been due to an internal condition of the cargo, plaintiffs must also prove the actual good condition of the cargo at the time of delivery to the carrier, not just that it appeared to be in good condition. *Caemint Food, supra,* 647 F.2d at 353–54; *Hecht, Levis & Kahn, Inc. v. S.S. President Buchanan*, 236 F.2d 627, 631 (2d Cir.1956); *The Niel Maersk*, 91 F.2d 932, 934 (2d Cir.), *cert. denied*, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937). Under this standard, plaintiffs must show that the goods were in fit internal order and condition to survive the voyage for which they were booked.[11] *Perugina Chocolates v. S/S Ro Ro Genova*, 649 F.Supp. 1235, 1241 (S.D.N.Y.1986) (quoting *Commodity Service Corp. v. Boston Ins. Co.*, 1964 A.M.C. 926, 939 (S.D.N.Y.1964), *aff'd*, 354 F.2d 234 (2d Cir.1965)). However, this burden may be carried by circumstantial proof, such as testimony as to the nature of the goods and the type of damage suffered. *See S.M. Sartori, Inc. v. S.S. Kastav*, 412 F.Supp. 1181, 1183 (S.D.N.Y.1976).

■ Here, the Court finds that plaintiffs have shown by a preponderance of the evidence the good condition of the cheese delivered to Spanish Lines. Inspections by both the Italian government and Parmalat certified this cheese to be suitable for export, and no damage of the type noted on June 8 was observed at that inspection.

Moreover, similar cheese from the same source, delivered at about the same time and shipped at nearly the same date in an unrefrigerated container, arrived without damage. There is thus no evidence to support defendant's argument that an inherent vice in the cheese did not permit it to survive a reasonable voyage in an unrefrigerated container.

■ However, as noted above, to recover under COGSA, plaintiffs must also show discharge of the goods in a damaged condition. *See Goya Foods, Inc. v. S.S. Italica*, 561 F.Supp. 1077, 1083 (S.D.N.Y.), *aff'd*, 742 F.2d 1434 (1983). The provisions of COGSA apply from loading until the goods are discharged from the vessel. *See* 46 U.S.C.App. § 1301(e); Schoenbaum, *Admiralty and Maritime Law* at 318. (1984). Where, as here, there is no direct evidence of the condition of the cheese at discharge from the vessel, a shipper of goods may establish a prima facie case by proving that the nature of the damage is such that it is reasonable to infer that the damage occurred while the cargo was in the carrier's custody. *Caemint Food, supra,* 647 F.2d at 355; *see Elia Salzman Tobacco Co. v. S.S. Mormacwind*, 371 F.2d 537, 539 (2d Cir.1967). However, if it appears that it was as likely that the damage occurred after discharge as before, the shipper has not established a prima facie case. *See Goya Foods, supra,* 561 F.Supp. at 1083.

■ In this case, while it is true that the temperatures in the Gulf ports reached 89 degrees, there was no evidence that during the voyage the high temperatures were prolonged and consistent enough to have caused the damage noted on June 8. This is significant because even plaintiffs' expert conceded that, due to an insulating effect, it would take some time for outside temperatures to affect the internal temperatures of the cheese.

The Court concludes, therefore, that the heat damage to the cheese was as likely, if not more likely, to have occurred on the

---

11. Moreover, because the cheese was shipped in a sealed container, plaintiffs may not rely only upon a clean bill of lading to establish a prima facie case. *See Caemint Food, supra,* 647 F.2d at 352.

pier during the heat wave, when the temperature reached over 90 degrees for a period of days, as it was to have occurred prior to discharge. *See Goya, supra,* 561 F.Supp. at 1083–85. It follows that plaintiffs have not proven discharge of the cheese from the vessel in damaged condition and has not proven a prima facie case under COGSA.[12]

However, plaintiffs also argue that the carrier is liable under the Harter Act, 46 U.S.C.App. §§ 190–196 (Supp. IV 1986) or as a bailee for failing to refrigerate or otherwise care for the cheese at the pier. The Harter Act applies from the time that discharge from the vessel is effected until proper delivery of the cargo to a fit and proper wharf at the port of destination has been made. *See Caterpillar Overseas, S.A. v. S.S. Expeditor,* 318 F.2d 720, 723–24 (2d Cir.), *cert. denied,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); *Goya Foods, supra,* 561 F.Supp. at 1085. This duty of care is governed by the customs of the discharge port. *English Electric Valve Co. v. M/V Hoegh Mallard,* 814 F.2d 84, 87–88 (2d Cir.1987). The carrier has the duty to notify the consignee of the vessel's arrival and protect the cargo until the consignee has a reasonable opportunity to remove it. *Farrell Lines Inc. v. Highlands Ins. Co.,* 696 F.2d 28, 29 (2d Cir.1982); *Insurance Co. of N. Am. v. S/S Italica,* 567 F.Supp. 59, 62 (S.D.N.Y.1983).

Plaintiffs rely on several cases which have imposed liability upon a carrier for discharging goods to an unheated pier where there is knowledge that the cargo is subject to damage from freezing conditions. *See S/S Italica, supra,* 567 F.Supp. at 62; *British West Indies Produce, Inc. v. S/S Atlantic Clipper,* 353 F.Supp. 548, 552

(S.D.N.Y.1973); *see also Levatino Co. v. American President Lines, Ltd.,* 337 F.2d 729, 730 (2d Cir.1964) (evidence established that cargo was likely to freeze under the circumstances and the carrier took no precautions to protect the cargo). However, these cases are not dispositive where, as here, there is no proof that it was generally known that cheese of this type would melt if not stored in a refrigerated warehouse during high temperatures, and where, concededly, no specific information as to that fact was brought to the attention of the carrier.

Plaintiffs failure to so notify the carrier is material since plaintiffs have not demonstrated any custom or practice to refrigerate cheese of this type at the pier.[13] Indeed, the evidence was that this type of cheese does not ordinarily melt; that plaintiffs' own expert was uncertain as to the melting point of the cheese; that no such damage had occurred in the past; that the plaintiffs had customarily elected to ship the cheese at that time of year in unrefrigerated containers; and the heat wave in New Jersey had not begun until several days after delivery to the pier. In addition, there was no evidence that the carrier was aware that there would be any delay in Italusa's pickup of the cheese due to the Customs difficulty.

Finally, plaintiffs made no attempt to notify the carrier that the unrefrigerated container of cheese would require any special treatment at the pier because of the unusually high temperatures, although they were aware of the arrival date of the vessel. Moreover, as the record reflects, available refrigerated space is not always available on short notice. *See Tr.* at 82–85. Furthermore, the melting properties of a

---

12. *English Electric Valve Co. v. M/V Hoegh Mallard,* 814 F.2d 84 (2d Cir.1987) is not to the contrary. In that case, a shipment of electronic cargo was discharged and stored for three weeks until the shipper's trucker picked it up. *Id.* at 85–86. The carrier conceded at oral argument that it had retained custody and control of the cargo from discharge until the cargo was picked up by the shipper. *Id.* at 88. The Court held that the shipper had made out a prima facie case because storms during the voyage and heavy rains during storage indicated that the

water damage to the cargo, some of which was attributable to salt water, occurred while it was in the carrier's custody. *Id.* Significantly, rust was discovered by the shipper one day after the delivery of the goods, and therefore, it was likely that the damage occurred to the goods during the voyage. *Id.*

13. In fact, there were no refrigeration facilities at this pier, although refrigeration could have been arranged. *See Tr.* at 388–89.

particular cheese is not a matter of common knowledge, such as the freezing properties of liquids, that may reasonably be charged to the carrier. The Court finds, therefore, that the delivery to an unrefrigerated pier was not an improper delivery under the Harter Act. *See Goya Foods, supra,* 561 F.Supp. at 1085–86.

For the same reasons, the defendant cannot be liable for damage to the plaintiffs on the theory that defendant was a negligent bailee. *See Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 811–12 (2d Cir. 1971); *David Crystal, Inc. v. Cunard Steam–Ship Co.,* 339 F.2d 295, 298 (2d Cir.), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965). As noted above, the plaintiffs chose to ship in an unrefrigerated container, gave no special instructions or indication that the cheese should be refrigerated and made no arrangements on its own for refrigeration on the pier. These facts are significant in light of plaintiffs' knowledge of the arrival date of the cheese, the customs difficulty and the unusually high temperatures, and plaintiffs' knowledge that shipping this cheese in unrefrigerated containers at this time of the year was risky.

In short, plaintiffs have not shown that defendant breached any duty of reasonable care with respect to the cheese or that any negligence by the defendant caused plaintiffs damage. Indeed, the Court finds by a preponderance of the evidence that plaintiffs' own conduct in shipping the goods in an unrefrigerated container and making no provision for refrigeration on delivery was in fact the proximate cause of their injury.

 Plaintiffs also argue that there was an unreasonable deviation in this case. A geographic deviation is a departure from the normal route of sailing between the port of loading and the port of discharge, *i.e.,* "when a vessel 'wander[s]' or 'stray[s]' ... from the customary course of the voy-

age." *General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 84 (2d Cir.1983) (*quoting Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1313 (5th Cir.1979)), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); G. Gilmore & C. Black, *The Law of Admiralty* at 177 (2d Ed.1975). A customary route is one which is established and published to the world. *General Elec., supra,* 706 F.2d at 85; *Goya Foods, supra,* 561 F.Supp. at 1086.

Here, Spanish Lines clearly had two services to the United States, one to the East Coast and one to the Gulf Coast. The Thalassini Kyra was noticed as being used in both the East Coast and Gulf services. Moreover, the testimony indicated that the Thalassini Kyra was chartered to go to the Gulf ports, and later had New York added as its last port of call. The vessel followed the Gulf route it was chartered to take, and then proceeded to New York. It cannot be said, therefore, that the vessel deviated from its announced course, or that it stopped at any ports other than those it was advertised as taking. *See B.M.A. Indus., Ltd. v. Nigerian Star Line,* 786 F.2d 90, 92 (2d Cir.1986) (misdelivery); *Italia di Navigazione, S.p.A. v. M.V. Hermes I,* 724 F.2d 21, 22 (2d Cir.1983) (non-delivery). Indeed, plaintiffs have not cited, nor has the Court found, a case in which a deviation was found where the vessel stopped at no unannounced ports.[14]

In sum, plaintiffs' claim is essentially that the cargo should have been placed on another ship, not that the ship upon which it was placed deviated from its announced ports of call. In effect, plaintiffs argue that they reasonably relied on the fact that the cargo would be shipped on the next available ship taking the most direct route. However, plaintiffs offered no proof as to what plaintiffs' or their agent's expectations were in that regard or that those expectations would have been reasonable.

However, the Second Circuit has cautioned that quasi-deviation should not be extended beyond that situation. *See Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser,* 507 F.2d 68, 72 (2d Cir.), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1974).

---

**14.** Other than geographic deviation, the concept of quasi-deviation or fundamental breach of the contract has been accepted where under deck cargo is stored on deck. *See, e.g., Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir.1969); *Jones v. The Flying Clipper,* 116 F.Supp. 386, 389 (S.D.N.Y.1953).

Moreover, there was no proof that any conduct of defendant could rationally be construed as making any representation express or implied that they would ship the cargo on the next available ship taking the most direct route or that any custom or practice in the industry imposed that obligation on the carrier, or indeed supported that reasonable expectation in the shipper.

## CONCLUSION

For the reasons set forth above, the complaint is dismissed. The Clerk shall enter judgment for the defendant and close the above-captioned action.

It is SO ORDERED.