814 F.2d 84
 1987 A.M.C. 1351
 ENGLISH ELECTRIC VALVE CO., LTD., Plaintiff-Appellant,
v.
M/V HOEGH MALLARD, her engines, tackle and boilers, etc.,
Westwood Shipping Lines; Alliance Skibs A/S; and
Lief Hoegh & Co., A/S, Defendants.
Westwood Shipping Lines, Defendant-Appellee.
 No. 390, Docket 86-7584.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 4, 1986.
Decided March 12, 1987.
 
 Craig S. English, New York City (Chalos, English & Brown, P.C., New York City, Peter Skoufalos, New York City, of counsel), for plaintiff-appellant.
 Robert J. Giuffra, New York City (Dougherty, Ryan, Mahoney, Pellegrino, Guiffra & Zambito, New York City, John J. Hession, New York City, of counsel), for defendant-appellee.
 Before FEINBERG, Chief Judge, NEWMAN and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant English Electric Valve Co., Ltd. ("EEV") appeals from a judgment of the United States District Court for the Southern District of New York (Lasker, J.), after a non-jury trial, in favor of defendant-appellee Westwood Shipping Lines ("Westwood"). Judge Lasker ruled that EEV failed to establish a prima facie case under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. Secs. 1300-1315 (1982 & Supp.1983), because it failed to establish that the cargo was damaged while in defendant carrier's custody. Furthermore, Judge Lasker ruled that had EEV stated a COGSA claim, COGSA's $500.00 per package liability limitation, 46 U.S.C. Sec. 1304(5), would apply.[1] Because it is now apparent that Westwood retained custody of the cargo from the time of its discharge from the ship throughout its storage on the quay, and because the water damage necessarily occurred during the ocean voyage or the storage period, we reverse the judgment of the district court and remand for judgment in the amount of $2,500.00 to be entered for appellant.
 
 BACKGROUND
 
 2
 This suit arises out of the shipment of electronic cargo from Oakland, California to Tilbury, England. The cargo arrived at its destination with sufficient water damage to render it unsalvageable. At issue in the district court was (1) whether the damage occurred while the cargo was in custody of Westwood, the shipping company, and (2) whether Westwood could avail itself of COGSA's $500.00 per package limitation on liability. After a three-day non-jury trial, the district court made detailed findings of fact reported at 637 F.Supp. 1448 (S.D.N.Y.1986).
 
 
 3
 Appellant EEV was the consignee of the shipment, which included a modulator purchased for $236,880.00 from the shipper, Aydin Energy Division ("Aydin"). Aydin's freight forwarder booked the shipment with appellee Westwood's agent, Norton Lilly Co. ("Norton"), and indicated that the cargo was "electronic equipment," to be handled as a house-to-house shipment, but requested neither special handling nor stowage below deck. In a house-to-house shipment the shipper packs the cargo into a container provided by the carrier and delivers it to the carrier. Norton booked the shipment for loading at Oakland, California, and discharge at Tilbury, England, aboard Westwood's ship, the M/V Hoegh Mallard.
 
 
 4
 Aydin packed the modulator components in five wooden crates, which were then placed in an open top container provided by Westwood. The modulator cabinet was enclosed in an aluminum envelope, cushioned and surrounded by paper packing material and bags of a drying agent. It was then packed in the largest wooden crate, which extended about fourteen inches above the open top container. The top of the container was covered with a tarpaulin. Normally an open top container is designed to be stowed on deck; once covered with a tarpaulin, it should withstand spray and rain conditions. When a container holds over-height cargo, as was the case here, the tarpaulin is distorted and no other containers can be stacked on top of it.
 
 
 5
 On December 1, 1981, the open top container was delivered, at the Oakland pier, to Westwood's stevedore, which noted that the container was a "rag top" and "oversize." The cargo was loaded aboard ship and the bill of lading was issued by Westwood. The bill of lading provided, in Clause 20, that goods in containers
 
 
 6
 may be carried on deck at carrier's option without notice to the shipper, consignee or owner of the goods, and, if carried on deck, the carrier shall not be required to specially note, mark or stamp any statement of on deck carriage on this bill of lading, any custom to the contrary notwithstanding.
 
 
 7
 Joint App. at 283. Westwood had a tariff on file with the Federal Maritime Commission, which provided in Rule 110B that:
 
 
 8
 Rates named in this tariff will apply on shipments tendered for transportation, provided that all freight received for transportation in or on containers ... is received "To be held and Transported on Deck." Shippers may not request deviation from this provision.
 
 
 9
 Joint App. at 408. On previous occasions, Aydin's freight forwarder had booked with Westwood similar over-height electronic equipment stored in open top containers for carriage in the Pacific Coast-Northern Europe trade, and had been informed that such cargo would be stowed on deck. Westwood's eastbound service generally permitted stowage of containers only on deck, because below deck was usually filled with lumber, pulp and plywood loaded in the Pacific Northwest. Prior to loading at Oakland, the ship had loaded cargo at other northwest ports. Consequently, the over-height open top container could be stored below deck only by removing twenty containers on top of hatch 2, and by replacing one container below hatch 2 with the over-height container of electronic equipment. Evidently, the over-height container would have had very little clearance below deck, which would increase the risk of crushing. The container was stowed on deck, therefore, atop hatch 4, in the third and top tier.
 
 
 10
 Off the coast of Mexico, the ship encountered the worst weather of the voyage, with winds of force 6-7 on the Beaufort scale and waves of four to six meters. On January 9, 1982, between Antwerp, Belgium and Tilbury, the ship again encountered force 7 winds and sea spray on deck. No indication of any damage to the open top container or its tarpaulin was recorded by the crew. Upon discharge at Tilbury on January 11, however, the tarpaulin was found to be torn. After discharge, the container was stored in an open container park to await customs clearance. The container was stored until February 2 at EEV's request. During that period, there were several heavy rains at Tilbury.
 
 
 11
 On February 2, a trucker hired by EEV's customs broker transported the container to EEV's facility twenty-five miles away. While the delivery note prepared by the trucker contained no notation of damage upon pickup, EEV's manager, Barry Jennis, endorsed the note: "Received damaged, by shipping company & sea water." Joint App. at 280. Water flowed out of the container when opened, the top of the modulator crate was broken and a piece of plywood had pierced the sealed aluminum envelope enclosing the cabinet. The other crates also contained rusted, water-damaged equipment.
 
 
 12
 A marine surveyor, hired by EEV, concluded that the damage was caused by ingress of salt and freshwater into the container, and noted that upon delivery to EEV both the container and tarpaulin were in sound condition. The conflicting evidence that the tarpaulin was torn at discharge in Tilbury, but yet was in sound condition upon delivery to EEV, has not been explained. The surveyor's report revealed that silver nitrate tests on the packing material from the four small crates showed salt content, presumably from saltwater. However, the padding between the aluminum envelope and the cabinet revealed no salt content. There was evidence of freshwater wetting of the cabinet. An internal memo prepared by an employee-adjuster of the marine surveyor hypothesized an explanation: that the heavy rains at Tilbury entered the modulator cabinet crate, and that the tarpaulin was adjusted shortly before final delivery. Joint App. at 480.
 
 
 13
 The shipment was a total loss, and EEV brought suit against Westwood under COGSA, 46 U.S.C. Secs. 1300-1315 (1982 & Supp.1983). The district court held that EEV failed to make a prima facie case that the goods were damaged while in Westwood's custody, because although the goods evidently were in good condition when delivered to Westwood, EEV failed to show that the cargo was damaged prior to leaving Westwood's custody. Joint App. at 502. Specifically, the district court gave very limited weight to the marine surveyor's silver nitrate test, finding that while a negative result would rule out any presence of sea water, the positive result was not definitive because chloride in the packing materials could have come from "absorption of atmospheric chlorides during the ocean voyage and during storage." Joint App. at 503. Additionally, the court found that EEV or its agent was responsible for the cargo following discharge from the vessel, through storage and ultimate delivery. Although the court found that EEV had not established its prima facie case, it noted that the defendant failed to prove that EEV's packaging was insufficient, thus eliminating that defense as an "excepted cause" of liability under 46 U.S.C. Sec. 1304(2)(n). The district court also found that stowage of the cargo on deck was not an unreasonable deviation from the contract of carriage, and therefore, even if Westwood could have been held liable for the damage, that liability would be limited to $500.00 per package, or a total of $2,500.00 for the five packages, under COGSA, 46 U.S.C. Sec. 1304(5). This appeal followed.
 
 DISCUSSION
 
 14
 EEV contends that the district court erred both by ruling that EEV failed to make a prima facie case and by finding that the COGSA liability limitation would apply. Preliminarily, we note that because the district court found no liability on Westwood's part, that portion of the district court's opinion discussing the COGSA liability limitation is dictum. However, because we find that EEV succeeded in presenting a prima facie case, we also address the issue of the COGSA liability limitation, and agree with the dictum of the district court, which was helpfully added to avoid delay in the event that the court's holding was set aside on appeal.
 
 I. Prima Facie Case
 
 15
 To make a prima facie showing under COGSA that Westwood was liable for damage to the cargo, EEV must show that the cargo was delivered to the carrier in good condition and that the cargo either did not reach the destination or left the carrier's custody in damaged condition. Caemint Food, Inc. v. Brasileiro, 647 F.2d 347, 352 (2d Cir.1981); Vana Trading Co., Inc. v. S.S. Mette Skou, 556 F.2d 100, 104 (2d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). It is undisputed on this appeal that EEV delivered the cargo to the carrier in good condition. See Madow Co. v. S.S. Liberty Exporter, 569 F.2d 1183, 1185 (2d Cir.1978); Goya Foods, Inc. v. S.S. Italica, 561 F.Supp. 1077, 1082 (S.D.N.Y.), aff'd mem., 742 F.2d 1434 (2d Cir.1983). The critical question becomes, therefore, whether EEV proved that the shipment was in a damaged condition when it left Westwood's custody. This question turns on a secondary question of when custody of the cargo changed from Westwood to EEV. The district court answered the primary question in the negative, but, unfortunately, never indicated at what point the goods left Westwood's custody. Rather, after recognizing that the Port of London Authority acted as Westwood's agent in off-loading the cargo and placing it in storage, the court noted that EEV requested that the cargo remain stored on the quay until February 2, when EEV's trucker picked it up. The district court stated: "Under these circumstances, it is fair to say that EEV or its agent was in control of and responsible for the cargo following discharge from the vessel." Joint App. at 506.
 
 
 16
 Appellant contends that the district court erred because its ruling, in effect, equates discharge from the ship with delivery to EEV or its agents--a ruling at odds with the Harter Act, 46 U.S.C. Secs. 190-196, which governs a carrier's post-discharge liability. See Constable v. National Steamship Co., 154 U.S. 51, 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903 (1894). Indeed, while COGSA defines a carrier's liability "from the time when the goods are loaded on to the time when they are discharged from the ship," G. Gilmore & C. Black, The Law of Admiralty Sec. 3-25, at 147 (1975), the Harter Act applies until the carrier delivers the cargo. The Harter Act generally imposes a non-waivable duty of care upon the carrier during the post-discharge, pre-delivery period.[2] This duty of care is measured by the custom, usage and regulations of the discharge port. 46 U.S.C. Secs. 190-191; see Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F.2d 720, 723-24 (2d Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963).
 
 
 17
 However, we need not rely on the Harter Act to determine that custody passed at some time after discharge in this case because appellee conceded at oral argument that Westwood retained custody throughout the period the cargo was stored on the quay--from discharge on January 11, until pick-up by EEV's trucker on February 2:
 
 
 18
 Judge Miner: [T]he judge never made a determination, a finding, that is, as to when exactly custody changed.
 
 
 19
 Appellee: I would agree with that Your Honor. But I think under the prior decision in this case, we have to agree that at least when the container was picked up by the trucker, that was when delivery passed custody.
 
 
 20
 Judge Miner: You are willing to concede that you had custody up to the time that the trucker ...
 
 
 21
 Appellee: I would think for the purposes argued the answer is yes, Your Honor.
 
 
 22
 ....
 
 
 23
 Judge Feinberg: You concede that it was under your custody until February 3rd?
 
 
 24
 Appellee: I would think, I can't, ... it was in our custody up to a certain point.
 
 
 25
 Judge Miner: You just told me that it was, that you were in custody up to the time the trucker ...
 
 
 26
 Appellee: I would think for the purposes [of] arguing Your Honor, it was in custody until that particular time, February 2.
 
 
 27
 We note that this concession by Westwood at oral argument is in accord with two telexes sent by Westwood's agent to Westwood in response to its inquiry about who had custody and control of the cargo while it was stored on the pier. Joint App. at 277-79. On the basis of this concession, we find that Westwood retained custody of the cargo until February 2, when EEV's trucker picked up the container for delivery the next day.
 
 
 28
 Our determination that Westwood retained custody until February 2 requires reversal of the district court's holding that EEV failed to make a prima facie showing that the cargo was damaged while in the carrier's custody. The two storms during the voyage, the torn tarpaulin upon discharge, and the heavy rains during storage on the quay all indicate that the water damage occurred while the cargo was in Westwood's custody. Furthermore, the fact that rust had already formed when the container was opened on February 3 negates the possibility that the water damage occurred between February 2 and February 3, when the trucker had custody. Having found that EEV made out a prima facie case, we note the district court's ruling that Westwood did not meet its burden of proof on its defense to liability under 46 U.S.C. Sec. 1304(2)(n) (insufficient packaging), a ruling not challenged on appeal. Therefore, we hold that Westwood is liable for the damage to the cargo, and we turn to the issue of the COGSA $500.00 per package liability limitation.II. COGSA Liability Limitation
 
 
 29
 COGSA limits a carrier's liability for cargo damage to $500.00 per package unless the shipper has declared the value of the cargo and that value is reflected on the bill of lading. 46 U.S.C. Sec. 1304(5). An exception to this limitation applies if the carrier engaged in an unreasonable deviation from the contract of carriage, because such a deviation is a fundamental breach of the contract.
 
 
 30
 EEV asserted that Westwood's on-deck stowage of the open top container was an unreasonable deviation from the contract of carriage. In Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855 (2d Cir.1985), we stated the rule that "absent an agreement or an established custom from which consent of the shipper for on-deck stowage may be imputed, a clean bill of lading imports stowage below deck." Id. at 859. It is undisputed that Westwood issued a clean bill of lading, ordinarily indicating below deck stowage. However, the district court, after a thorough analysis, determined that the shipper, through its agent, had actual notice of Westwood's practice of stowing over-sized, open top containers with electronic equipment on deck, through prior dealings. Indeed, EEV's expert witness admitted that the normal practice was for the shipper to notify the carrier if it wanted sensitive cargo stowed below deck, a request that was not made in this instance.
 
 
 31
 The district court found that the shipper's consent to on-deck stowage could also be inferred both from the tariff rates, applicable only to on-deck stowage, and from Clause 20 of Westwood's bill of lading, reserving to the carrier the option to carry containers on deck. While appellant contends that our holding in Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer, 422 F.2d 7 (2d Cir.1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), requires that the option clause be given no effect, we find the case before us distinguishable. In Hong Kong Producer we held that a short form bill of lading that incorporated the terms of the long form bill, which in turn contained a similar on-deck stowage option clause, was a contract of adhesion; the shipper had no actual notice of the carrier's option, and other long form provisions impermissibly shifted the carrier's burden of proof and risk of loss to the shipper. Hong Kong Producer is distinguishable from the case before us. Here, the shipper had actual notice of the on-deck stowage option and also had notice through prior practice that on-deck stowage was usual for cargo on the Pacific Northwest-Northern Europe route. Thus, the district court could give effect to the option clause. Additionally, the court concluded that the custom and practice in the industry is to carry open top containers on deck when the vessel specifically is designed for such use, as was Westwood's ship. This conclusion was based on uncontroverted testimony from witnesses for both parties.
 
 
 32
 The district court's conclusions--that on-deck stowage was the custom and practice, both in the industry and as between this shipper and carrier, and that an implied agreement contemplated on-deck stowage--are squarely grounded in findings of fact. We hold, therefore, that on-deck stowage of the over-height, open top container did not constitute a deviation from the contract of carriage. Furthermore, under the standard of Du Pont de Nemours International S.A. v. S.S. Mormacvega, 493 F.2d 97 (2d Cir.1974), even if stowage on-deck was a contractual deviation, we would find that it was a reasonable one. On-deck stowage was reasonable in light of evidence that below-deck stowage presented a risk of crushing to the over-height cargo due to insufficient clearance space between the cargo and the hatch.
 
 
 33
 As we find that there was no unreasonable deviation from the contract of carriage, the COGSA liability limitation of $500.00 per package applies.CONCLUSION
 
 
 34
 Reversed and remanded for judgment in the amount of $2,500.00 to be entered for appellant.
 
 
 
 [1]
 Only the second portion of the district court's decision, relating to the COGSA liability limitation, is reported at 637 F.Supp. 1448 (S.D.N.Y.1986)
 
 
 [2]
 The district court relied in part on Clause 15 of Westwood's bill of lading, which provided that
 the carrier's responsibility as carrier shall cease when the goods leave its custody at point of discharge, and in making arrangements with the connecting carrier, the carrier shall be considered solely as the agent of the shipper, owner, or consignee of the goods....
 The district court read this language "as contemplating a relinquishment of custody by the carrier following discharge of the cargo from the vessel and during that period when arrangements for storage and on-carriage are being directed by the consignee through its agent." Appellant argued that the district court's interpretation of Clause 15, equating discharge with delivery, was erroneous because it eliminates any post-discharge Harter Act liability. We note that the district court's interpretation of Clause 15 is similar to the explicit terms of a bill of lading equating discharge with delivery that we held void as an invalid contractual attempt by the carrier to "eliminate the operation of the Harter Act upon foreign trade." Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F.2d 720, 722-23 (2d Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); see Allied Chemical Int'l Corp. v. Companhia De Navegacao Lloyd Brasileiro, 775 F.2d 476 (2d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir.1971).