CONSTRUCTORES TECNICOS, S.
de R.L., Plaintiff–Appellee–
Cross–Appellant,

v.

SEA–LAND SERVICE, INC. and San
Miguel Shipping, S.A., Defendants–
Appellants–Cross–Appellees.

No. 90–3355.

United States Court of Appeals,
Fifth Circuit.

Oct. 10, 1991.

Robert B. Deane, John N. Critchlow, Douglas L. Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants-appellants-cross-appellees.

George J. Fowler, III, Mary C. Shaddock, Rice, Fowler, Kingsmill, Vance & Flint, New Orleans, La., for Constructores Tecnicos.

Norman Charles Sullivan, Jr., Brian L. Thompson, Gelpi, Sullivan, Carroll & Laborde, New Orleans, La., for Sea-Land Services, Inc.

Before WISDOM, KING and DUHÉ, Circuit Judges.

KING, Circuit Judge:

This case arises from the shipment of a truck and drilling rig from New Orleans. Enroute to Honduras, the vessel encountered rough weather and the cargo was damaged. The shipper sued the shipowner and the charterer for the lost value, and won in the district court. This appeal by the shipowner and the charterer requires us to resolve questions of a carrier's liability under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 *et seq.*, the proper apportionment of damages between settling and non-settling defendants, and the district court's refusal to order the shipowner to indemnify the charterer. Finding that the district court properly resolved the COGSA and indemnity questions, but erred in apportioning damages, we affirm in part, reverse in part and remand.

## I. BACKGROUND AND PROCEDURAL HISTORY

The Honduran government awarded Constructores Tecnicos, S. de R.L. (Contec), a Honduran company, a contract for the construction of 20 testing wells and 13 water wells in Honduras. In order to perform the work, Contec purchased a 1978 Ford LT 9000 Tandem Chassis diesel truck and various drilling accessories, including a portable drilling rig unit, from JWS Equipment, Inc. of Moore, Oklahoma. Contec partner Julio Pineda contacted Charles Pagan of Golden Eagle International Forwarding Co. (Golden Eagle), a freight forwarder, and requested that Golden Eagle arrange for transportation of the truck from Oklahoma to Puerto Cortes, Honduras.

Pagan made the transportation arrangements through Sea-Land Service, Inc. (Sea-Land). He filled out a Sea-Land bill of lading, listing the cargo which was to be shipped on the M/V CANEEL BAY but leaving the space for the freight rate blank. The bill of lading did not indicate whether the cargo was to be stowed on deck or below deck. Pagan then delivered the draft bill of lading to Sea-Land's office. On or about September 12, 1988, the truck and equipment were loaded on the M/V VERMILLION BAY, a vessel owned by San Miguel and chartered by Sea-Land. The truck and some of the equipment were secured to a flatrack, a form of open container, by chain lashings and stowed on

deck.[1] The M/V VERMILLION BAY sailed on September 13, but encountered severe weather in the Gulf of Mexico on the fringes of Hurricane Gilbert. During the storm, nearby containers broke free of their lashings and fell on top of the truck, causing severe damage to the truck. The ship changed course and docked at Port Everglades, Florida, where the truck was unloaded and deemed a constructive total loss.

Contec brought suit against Golden Eagle, Sea–Land and International Cargo and Surety Insurance Co. (International Cargo), the cargo insurer, *in personam*, and against the M/V CANEEL BAY and the M/V VERMILLION BAY *in rem*. Golden Eagle cross-claimed against Sea–Land and International Cargo, alleging that their fault caused the damage. Sea–Land then brought a third-party action against San Miguel and Japan Shipowners Mutual Protection & Indemnity Association (Japan Shipowners) alleging that they were liable as owner and insurer of the M/V VERMILLION BAY. Contec amended its complaint and added San Miguel and Japan Shipowners as direct defendants, and San Miguel counterclaimed against Sea–Land for indemnity and/or contribution.

The district court narrowed the issues for trial after various parties brought motions for summary judgment. San Miguel and Sea–Land filed a motion seeking to limit their liability in accordance with the $500 per package limitation of COGSA § 4(5), 46 U.S.C.App. § 1304(5). Contec and International Cargo filed cross-motions seeking resolution of the insurance coverage issues under International Cargo's policy. Sea–Land moved for summary judgment against Golden Eagle for the unpaid freight for the cargo, and Golden Eagle brought a summary judgment motion against Contec for these same freight charges. The court granted Contec's motion against International Cargo, holding that the loss was covered, and granted Golden Eagle's motion against Contec for the freight charge. The court denied the motions brought by Sea–Land and San Miguel against Contec, determining that issues of fact remained for trial.

Prior to trial, Contec settled its claims against International Cargo and Golden Eagle. The settlement between Golden Eagle and Contec for $40,000 was converted into two consent judgments. The court held a bench trial on April 9 and 10. At the conclusion of Contec's case, the court granted motions to dismiss the *in rem* claims because neither vessel had been served, and granted a motion to dismiss Japan Shipowners because the prerequisites for a direct action under Louisiana's Direct Action Statute had not been shown to exist. The court also granted Sea–Land and San Miguel's motions for dismissal insofar as they requested dismissal of Contec's claims for consequential damages.

The district court entered its findings of fact and conclusions of law in an oral ruling from the bench. The court found that Pagan and Pineda had never discussed on-deck shipment and that Contec had not consented to this method of shipment because Pagan never informed Pineda that Sea–Land retained the option to ship on-deck in the absence of an instruction in the bill of lading to ship below. Moreover, the court found no evidence to suggest that Sea–Land could not have shipped the truck below-deck, but rather that Sea–Land had made a decision to ship the cargo on-deck. The court found that the truck was a total loss, and that the damage was caused by its stowage on deck where it was susceptible to falling containers. The court attributed the truck's movement off the flatrack container to improper lashings, some of which were secured with pins that were too small and some of which were adversely affected by improper shackles or no shackles at all. The court found the actions of San Miguel in performing an inadequate job of lashing the container and Sea–Land in approving the lashings equally faulty and determined that neither was entitled to indemnification from the other. Golden Eagle was found to be 10 percent at fault because it knew but did not inform Contec of Sea–Land's policy of retaining the option

---

1. Other equipment was stowed in a separate container and was not damaged.

to store on-deck or below-deck in the absence of a specific instruction in the bill of lading, with the remaining 90 percent apportioned equally between Sea–Land and San Miguel.

The court determined that Contec had a right under *Ingersoll Milling Machine Co. v. M/V BODENA*, 829 F.2d 293 (2d Cir. 1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988), to assume that a clean bill of lading implied shipment below deck. Because shipment was on deck, the only question was whether this deviation was reasonable such that Sea–Land and San Miguel remained protected by the $500 per package limitation of liability provision of COGSA. The court held that the defendants did not sustain their burden of proving that the deviation was reasonable, and therefore proceeded to assess the damages owed by Sea–Land and San Miguel.

The court assessed the value of the truck at $79,823.26, which it reduced by $5,521.37, the cost of freight and insurance which would have been paid even had the truck arrived undamaged. The resulting figure was close enough to $75,842, the value placed upon the truck by Sea–Land's surveyor, that the court took the latter as the value. The court added $2,720.70 for the cost of storage between the time Contec learned the truck arrived in a damaged condition and the time Contec reclaimed it [2] and arrived at a total of $78,562.20. Sea–Land and San Miguel then filed a motion *in limine* for a credit equal to Contec's $40,-000 settlement with Golden Eagle. The court denied the motion, holding instead that Contec's recovery would be reduced only by an amount proportionate to Golden Eagle's fault, or a total of 10 percent.

Final judgment was rendered against Sea–Land and San Miguel jointly and severally for $70,706.43, plus prejudgment interest from November 1, 1988 until April 10, 1990 and all costs of the proceedings. Sea–Land and San Miguel timely filed appeals, and Contec cross-appealed.[3]

## II. DISCUSSION

Sea–Land and San Miguel together raise what we perceive to be two distinct issues on appeal. First, they contend that the district court should not have eliminated the protection of COGSA's per-package limit of liability because the *Ingersoll* presumption is inapplicable in this case. Alternatively, they contend that even if Contec had a right to presume under-deck stowage and the subsequent on-deck stowage was a deviation, it was a reasonable one and COGSA's limit still applies. Second, assuming liability beyond COGSA's limit exists, they argue that the district court should have credited their liability by the total amount of Contec's settlement with Golden Eagle rather than by Golden Eagle's proportionate share of liability. Additionally, Sea–Land contends that it is entitled to indemnity from San Miguel pursuant to the terms of their charter party agreement.[4] We address these points in turn.

### A. *COGSA Limitation of Liability*

■ COGSA limits an ocean carrier's liability for lost or damaged cargo to $500 per package unless the shipper has declared the value of the cargo and that value is reflected on the bill of lading. 46 U.S.C.App. § 1304(5). A carrier loses this

---

**2.** The court found that Contec learned in early November 1988 that the truck arrived damaged, but waited until April 11, 1989 to seek advice regarding removal. Accordingly, the court awarded Contec storage costs only for the period between April 11, 1989 and May 10, 1989, when Contec actually removed the truck. Contec does not contest this award on appeal.

**3.** Contec, however, did not challenge any portion of the district court's judgment either in its brief or at oral argument. Indeed, the brief at two points requests us to affirm the judgment in all respects, and, at oral argument, Contec's

counsel stated that his client would be happy just to go home with the judgment as it is. An argument must be briefed to be preserved, *see Price v. Digital Equipment Corp.*, 846 F.2d 1026 (5th Cir.1988), so we deem any arguments Contec might have in opposition to the judgment waived.

**4.** The parties have fully briefed the question whether the shipment was a customary freight unit within the meaning of COGSA, but, as we discuss below, our resolution of the COGSA issue renders the freight unit issue moot.

protection, however, if a deviation from the specifications contained in its contract of carriage with the shipper amounts to more than a reasonable deviation. *Id.* § 1304(4); *see Calmaquip Eng'g West Hemisphere Corp. v. West Coast Carriers, Ltd.*, 650 F.2d 633, 638 (5th Cir. Unit B 1981) (material deviation eliminates $500 per package limitation and transforms carrier into insurer of full value of shipper's goods); *Searoad Shipping Co. v. E.I. duPont de Nemours & Co.*, 361 F.2d 833, 835–36 (5th Cir.), *cert. denied*, 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed.2d 436 (1966). Stowing cargo on deck when a shipper has expressly requested below-deck stowage is a well-established unreasonable deviation from the contract which eliminates the protection of § 1304(5). *See, e.g., Calmaquip Eng'g*, 650 F.2d at 639; *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 17 n. 11 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

██ It is undisputed that the bill of lading for the shipment of the truck was silent as to where the truck was to be stowed, and therefore was a "clean" bill of lading.[5] The district court, relying on *Ingersoll*, held that a clean bill of lading entitles the shipper to presume below-deck stowage. It found, therefore, that Sea–Land's decision to stow above deck constituted an unreasonable deviation which stripped it of COGSA protection. Sea–Land and San Miguel contend that the presumption was erroneous in this case because Sea–Land had a right to rely on the apparent authority of Golden Eagle, the freight forwarder, as agent of Contec to bind Contec to contract of carriage under which Sea–Land reserved the right to decide where the cargo would be stowed. Contec responds that the *Ingersoll* presumption applies, so that any deviation from below-deck stowage allows it to recover the full value of the damaged cargo. Contec disputes the characterization of Golden Eagle as its agent, arguing that it

acted as an independent contractor without authority to bind Contec to an agreement whose contents were not known to Contec.

### 1. Does the Presumption of Below Deck Stowage Apply?

██ In *Ingersoll*, the Second Circuit, citing a line of authority dating back to the late 19th century, described the legal effect of a clean bill of lading: " '[A] clean bill of lading imports that the goods are to be safely and properly stowed *under deck.*' *The Delaware*, 81 U.S. (14 Wall.) 579, 602, 20 L.Ed. 779 (1871) (emphasis added)." *Ingersoll*, 829 F.2d at 304 (additional citation omitted). "If the document is silent as to stowage, the assumption is that the goods have been stowed below deck." *Id.* Absent an express agreement to the contrary or a port custom permitting on deck stowage, a shipper may presume that a clean bill of lading will result in carriage of the cargo below deck. *St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial Do Rio De Janeiro*, 263 U.S. 119, 123–24, 44 S.Ct. 30, 30–31, 68 L.Ed. 201 (1923); *Ingersoll*, 829 F.2d at 299; *Blasser Bros. v. Northern Pan–American Line*, 628 F.2d 376, 384 n. 13 (5th Cir.1980) ("[i]t is clear that if there is no definite agreement one way or the other, a shipper is entitled to expect below deck storage, unless there is a showing of a different custom in that port"); *Searoad Shipping*, 361 F.2d at 835–36 (citing *The Delaware* and *St. Johns N.F. Shipping Corp.* and stating that this is a "formidable principle"); 2A E. Benedict, *Benedict on Admiralty* § 123, at 12–11 (7th ed. 1987). It is the carrier's burden to overcome the presumption by introducing appropriate evidence of agreement or port custom. *Ingersoll*, 829 F.2d at 299; *see also Searoad Shipping*, 361 F.2d at 836.

██ The district court's factual findings that Contec never explicitly consented to on-deck stowage and that port custom in New Orleans did not provide for on-deck

---

5. The descriptive element of a "clean" bill of lading, as opposed to its legal effect (which we describe in the text), is its silence as to stowage or its provision for under-deck stowage. *See* 2A

E. Benedict, *Benedict on Admiralty* § 97, at 9–12 (7th ed. 1987) ("a clean bill of lading ... does not specifically provide for on-deck stowage").

shipment under a clean bill of lading were not clearly erroneous.[6] Appellants insist, however, that consent arises from Golden Eagle's status as Contec's agent. Because Golden Eagle operated on behalf of Contec, they argue, it was clothed with apparent authority, in the eyes of Sea–Land, to bind Contec to a contract of carriage in which Sea–Land retained the option to stow either on deck or below deck.[7] They distinguish *Ingersoll* as a case in which the shipper dealt directly with the carrier, rather than through an intermediary freight forwarder who had the power to bind the shipper to on-deck shipment, and argue that this difference renders the presumption discussed in *Ingersoll* inapplicable here.

■ We disagree with appellants' suggestion that there is a hard and fast rule deeming freight forwarders to be agents of shippers. The law in this circuit indicates that the question whether a freight forwarder acts as agent for either party to the contract of carriage tends to turn on the facts of the particular transaction under scrutiny. In *Strachan Shipping Co. v. Dresser Industries, Inc.*, 701 F.2d 483 (5th Cir.1983), our leading case on a freight forwarder's agency status, we rejected the arguments of both the shipper and the carrier that the freight forwarder was the agent of the other. In examining the relationship between the forwarder and the shipper in *Strachan*, we stated:

> In regard to [the shipper's] selection of [the forwarder], obviously this is an indication that [the forwarder's] actions can be attributed to [the shipper]. *Control of the manner in which the forwarder performs his duties, however, rather than selection has been the more important factor in deciding the agency question* ... It is undisputed that [the shipper] did not control [the forwarder's] actions in booking cargo. [The forwarder] was free to select the carrier or line on which to ship the goods ... [and the shipper] had little knowledge of the manner in which [the forwarder] performed its duties, much less controlled [the forwarder's] performance.

*Id.* at 488 (emphasis added) (citation omitted). The case before us presents a similar factual situation. As the district court described in its findings of fact, Contec simply entered the marketplace for ocean carriage by contacting a freight forwarder and asking it to arrange for shipment of a truck. There was no evidence that Contec and Golden Eagle had any prior or ongoing relationship, that Contec requested a particular carrier, that Contec knew of Sea–Land, or that Contec controlled or directed in any way Golden Eagle's selection of an appropriate carrier. San Miguel correctly argues from these facts that Golden Eagle "entered into the contract of carriage on behalf of the shipper," but the conclusion it believes follows—that Golden Eagle's knowledge concerning Sea–Land's practices may be imputed to Contec as a result of an agency relationship—is incorrect without the missing link of control by the shipper over the forwarder's actions.

■ Sea–Land and San Miguel contend that a finding of agency should result from Golden Eagle's knowledge, through prior dealings with Sea–Land, of Sea–Land's policy of reserving the right to decide on the cargo's location when the shipper does not specifically request below-deck stowage.[8]

---

**6.** The district court made this finding after hearing the testimony of Pineda, the officer of Contec who arranged for shipment of the truck. The court stated:

> [W]hen Mr. Pineda contacted Mr. Pagan of Golden Eagle, no one discussed any freight rates with him nor did anyone mention on deck shipment ... Contec had no opportunity to even agree on anything, above or below deck.

This finding was not clearly erroneous and will not be disturbed on appeal. *See Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.*, 432 F.2d 103, 105 (5th Cir.1970) ("In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous") (quoting *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954)).

**7.** Pagan of Golden Eagle testified that he knew the carrier retained the option of stowing goods on deck and that, as a matter of practice, if he desired under-deck stowage he was required to so inform the carrier.

**8.** They also argue that Pagan knew the truck would be carried on deck because he knew the M/V CANEEL BAY (the original vessel on

This argument, which relies on the Second Circuit's decision in *English Electric Valve Co., Ltd. v. M/V HOEGH MALLARD*, 814 F.2d 84 (2d Cir.1987), amounts to arguing the agency issue in reverse. In *English Electric Valve*, a shipper's consignee was held not entitled to rely on the presumption of below-deck stowage under a clean bill of lading where its freight forwarder had booked similar shipments with the carrier and knew of the carrier's practice of stowing the particular type of cargo (electronic equipment in over-sized containers) on deck. *Id.* at 89. The court began its analysis of the shipper's implied consent, however, by simply asserting that the forwarder acted as agent for the shipper. *Id.* The court offered no independent analysis of the agency question, but proceeded directly to describe how the shipper was deemed to have had "actual notice" of the carrier's policy of stowing oversized, open top containers with electronic equipment on deck because of the forwarder's prior dealings. *Id.* *English Electric Valve* makes clear the proper analysis: the court must *first* find under the facts of a particular case that the forwarder acts as the shipper's agent; only then can the agent's knowledge of the carrier's practices (however acquired) fairly be imputed to the shipper. The legal relationship of agency is the threshold question, and it cannot be established by what the alleged agent knows. Central to the decision in *English Electric Valve* is the court's assumption that the forwarder acted as agent for the shipper. Only then could the agent's knowledge of the carrier's usual custom of storing over-sized containers on deck be deemed sufficient to bind the shipper to a contract in which the shipper consented to on-deck stowage.[9] Golden Eagle may have had an obligation to tell Contec of Sea–Land policies it knew about, as the appellants argue, but its failure to do so goes to its responsibility for the damage (which the district court fixed at 10 percent) and not its ability to give Contec's consent for below-deck shipment.

Sea–Land and San Miguel also cite *Morrow Crane Co. v. Affiliated FM Insurance Co.*, 885 F.2d 612 (9th Cir.1989), for the proposition that a freight forwarder is the agent of the shipper. In *Morrow*, the shipper had a written contract with the forwarder in which the forwarder was directed to ensure shipment below deck "for insurance reasons." *Id.* at 613. The forwarder then entered into a contract with a shipper for carriage of cranes in which the shipper retained the right to stow on deck. The insurer of the shipment (whose policy would pay only for cargo damaged while in transit below deck) took the position taken by the appellants here that the agency relationship enabled the freight forwarder to give the shipper's consent to on-deck stowage. *Id.* at 614. As in *English Electric Valve*, the court simply assumed, without analysis, that the forwarder acted as the shipper's agent, and went on to apply long-standing agency principles of imputing the acts of the agent acting within his apparent authority to the principal. *Morrow*, 885 F.2d at 614. Certainly the facts supporting a finding of agency were considerably stronger in *Morrow* than here: the forwarder and the shipper had operated under a written agreement since 1981 and the forwarder had handled previous shipments of cranes for the shipper. But the court gave no indication of why it determined an agency relationship existed. The case

---

which the truck was to have been transported) was not a roll on-roll off vessel and could not take the cargo below deck. They further argue that under these circumstances Pagan knew he would have to make a request for below-deck stowage. We do not consider this knowledge any more relevant to Contec's consent than anything else Pagan knew about Sea–Land's practices.

9. Moreover, the district court in *English Electric Valve* had found that it was customary on the route taken by the shipper to stow containers on deck because the underdeck was loaded with wood products, and that it was industry custom and practice to store over-sized open top containers on deck. *Id.* at 89. Finally, the court determined that even if on-deck stowage was a deviation from the contract of carriage, it was a reasonable one because below-deck stowage "presented a risk of crushing." *Id.* No similar findings were made in the case before us.

therefore provides no support for the appellants' argument.[10]

The general statements of an agency relationship between freight forwarder and shipper in other cases cited by Sea–Land and San Miguel are equally unavailing. In *United States v. Ventura*, 724 F.2d 305, 310–11 (2d Cir.1983), the court merely repeated the view of a freight forwarder's status as explained by a government witness in the trial of two individuals charged with conspiracy and wire fraud in shipping freight to a government-financed project in Asia, but the question of agency was not itself at issue. Nor was agency at issue in *Hoffmann–LaRoche, Inc. v. M/V TFL JEFFERSON*, 731 F.Supp. 109 (S.D.N.Y.1990), when the court, in passing, noted that "[a]s a general matter, 'forwarders' act as agents of the shipper ... while 'carriers' are directly responsible for effecting the conveyance itself." *Id.* at 111 n. 2.

We think the fact that it was necessary in *Strachan* to analyze the possibility that the freight forwarder could be the agent of the *carrier* further detracts from any strict rule deeming forwarders to be the agents of shippers. We characterized 46 U.S.C. § 841b, which permits a carrier to compensate a forwarder, as "an express recognition of the fact that the forwarder performs services beneficial to the carrier." *Strachan*, 701 F.2d at 487. We went on to note, however, that many of the tasks performed by the forwarder, particularly preparation of the bill of lading, benefit both shipper and carrier. *Id.* at 487–88. We concluded, after examining the presailing activities of the forwarder in that case, that the forwarder was an independent contractor, and explained:

> This conclusion is most consistent with the unique position occupied by the forwarder in the shipping industry. While the forwarder performs a variety of functions benefiting both shipper and carrier, neither the shipper nor the carri-

er retains any substantial control over the forwarder's performance.

*Id.* at 488–89; *see also Olson Distributing Systems, Inc. v. Glasurit America, Inc.*, 850 F.2d 295, 296 (6th Cir.1988) (following *Strachan* and indicating question of agency is factual); *Farrell Lines, Inc. v. Titan Industrial Corp.*, 306 F.Supp. 1348, 1350 (S.D.N.Y.) (finding forwarder independent contractor), *aff'd*, 419 F.2d 835 (2d Cir. 1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970). The district court in this case made a finding similar to that in *Strachan*, determining that not only was Golden Eagle independent of any control by Contec, it was also independent of Sea–Land.[11] The independence of Golden Eagle from control by Contec or Sea–Land makes it impossible to conclude that Golden Eagle could bind Contec to any contract other than one to which Contec expressly consented. Absent express consent in the bill of lading as to the place of stowage, the shipper is entitled to a presumption of under-deck stowage.

◼ Even with our finding that Golden Eagle was not Contec's agent, we still must confront Sea–Land and San Miguel's argument that the district court improperly relied upon the presumption in *Ingersoll* because in that case the shipper made the contract directly with the ocean carrier. In the absence of an agency relationship between a shipper and freight forwarder, we do not read the presumption of below-deck stowage under a clean bill of lading as dependent upon whether the shipper itself obtained a clean bill from the carrier or the shipper's forwarder obtained one. The key under non-agency circumstances is not who obtains the bill, but rather its contents. If the shipper has in no way consented to on-deck stowage, and cannot be deemed to have done so through a freight forwarder acting as its agent,[12] the law's concern is with the shipper's expectations. It is immaterial whether the shipper or the ship-

---

10. Our discussion of *Morrow* should not be taken as approval of a finding of agency under the facts of that case. It is enough to note that the kind of relationship between the shipper and freight forwarder in *Morrow* does not exist here.

11. The district court stated, for example, that "Golden Eagle was all over the place for everybody."

12. *See English Electric Valve*, 814 F.2d at 89.

per's freight forwarder has made the arrangements under which a clean bill of lading has been obtained. Thus, the *Ingersoll* presumption is equally applicable where, as here, the shipper obtains a clean bill of lading for its shipment through the actions of a freight forwarder working as an independent contractor.

### 2. Was the Deviation Reasonable?

■ Because there was a deviation from the contract of carriage, we must next determine whether it was reasonable, for if it was, Sea–Land and San Miguel are still protected by COGSA's $500 per-package liability limitation. Sea–Land and San Miguel first contend that the deviation was in effect "harmless error" because on-deck stowage was not the proximate cause of the damage. "Whether a negligent act proximately causes certain damages is a question of fact ... [and] a court of appeals may not overturn a district court's findings with respect to such a question unless it determines that those findings are clearly erroneous." *Knotts v. United States*, 893 F.2d 758, 763 (5th Cir.1990) (per curiam) (footnote omitted); *see also Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir.1977).

The district court found that "the fact of on deck shipment may have been a factor because the damage occurred when a container tumbled over into the truck and damaged the truck after its lashings had broken...." The parties did not contest the fact that the truck was not protected inside a container, and Hans Baumann, a marine surveyor who inspected the damage when the M/V VERMILLION BAY docked at Port Everglades, gave extensive testimony about the inadequacy of the lashings holding the containers which came loose and struck the truck, the inadequacy of the lashings holding the truck to the flatrack, and the general plan of stacking containers on the deck. On the basis of this testimony, the district court's conclusion that on-deck stowage was the proximate cause of the damage was not clearly erroneous. That the causal question has been resolved differently in other cases, *see Jones v. THE FLYING CLIPPER*, 116 F.Supp. 386, 390 (S.D.N.Y.1953), does not detract from the reasonableness of the district court's findings here.

Sea–Land and San Miguel further argue, relying on *DuPont de Nemours International, S.A. v. S.S. MORMACVEGA*, 493 F.2d 97 (2d Cir.1974), that stowage of a container on the deck of a modern container ship is not an unreasonable deviation because containers stowed on deck are not necessarily subject to greater risks than containers stowed below deck. The simple answer is that the truck was not in a container. No evidence was offered to prove that an exposed truck on a flatrack on deck is subject to no greater risks than a truck carried the same way below deck. Sea–Land's mere assertion in its brief that the risk attending below-deck stowage was identical to the risk of on-deck stowage cannot disprove causation in the face of the contrary evidence before the district court.

Because nothing in the record points to express or implied consent by Contec for on-deck stowage of its truck, we affirm the district court's holding that the deviation from Contec's expectation of under-deck stowage was unreasonable. The COGSA liability limitation is not available to Sea–Land or San Miguel.

### B. *Apportionment of Damages Between Settling and Nonsettling Joint Tortfeasors*

■ Having found that nonsettling defendants Sea–Land and San Miguel each bore 45 percent of the responsibility for Contec's damages, the district court apportioned each 45 percent of the damages even though Golden Eagle had settled with Contec for an amount representing more than its 10 percent share of responsibility. Contec has therefore received more than 100 percent of the damages determined by the court, and Sea–Land and San Miguel argue

it was error not to reduce the amount they owed by the total dollar amount of Golden Eagle's settlement.

The district court erred in apportioning damages in this fashion. A nonsettling tortfeasor is entitled to full credit in the amount the plaintiff has received from a settling tortfeasor in order to ensure that the plaintiff does not recover more than the damages determined at trial. *Rollins v. Cenac Towing Co., Inc.*, 938 F.2d 599, 600–01 (5th Cir.1991) (per curiam); *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 591 (5th Cir.), *modified on other grounds,* 848 F.2d 498, *cert. denied,* 488 U.S. 981, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988); *see also Myers v. Griffin–Alexander Drilling Co.,* 910 F.2d 1252, 1256 (5th Cir.1990) (indicating that *Hernandez* adopted the rule of *Self v. Great Lakes Dredge & Dry Dock Co.,* 832 F.2d 1540, 1548 (11th Cir.1987), *cert. denied,* 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988), and prevents a plaintiff from recovering more than the damages determined at trial). The $40,000 Golden Eagle paid Contec represents a dollar figure greater than 10 percent (its percentage of fault) of the total damage award of $78,562.20. If Sea–Land and San Miguel are responsible for 90 percent of the damage award, as the district court held, Contec will receive $110,706.43, or the Sea–Land/San Miguel joint share ($70,706.43) plus Golden Eagle's settlement ($40,000). This would be improper under *Hernandez* and our subsequent precedent. Therefore, we remand for the entry of a judgment crediting Sea–Land and San Miguel's joint and several share of $70,706.43 by $40,000.

## C. *Indemnity Between Sea–Land and San Miguel*

 Sea–Land also appeals the district court's refusal to order San Miguel to indemnify it for the damages owed to Contec, pointing to a clause in the charter party agreement requiring the owner to indemnify the charterer for "any legal liability for loss or damage of or to cargo, after loading and prior to discharge." Sea–Land conveniently ignores another clause in the contract which provides that the charterer must indemnify the owner for any "loss

caused by cargo being loaded contrary to the terms of the Charter, by improper or careless loading, stowage or discharging of cargo by Sealand or Sealand's agents."

The district court found that both were equally negligent, cancelling out the cross-indemnity provisions:

> In terms of the indemnity running between [Sea–Land and San Miguel], I think the indemnifications are mutually exclusive. San Miguel chose the captain, San Miguel supervised the lashings. San Miguel approved the security of the cargo, and San Miguel provided the gear which was used in connection with the lashings. Sea–Land did the lashing and security of the cargo. Sea–Land approved the gear and equipment provided by San Miguel for that task. It seems to me that the culpability of the two are so inextricably intertwined that both parties are at fault, which of course trumps the indemnity agreements running between the two of them. Neither party, therefore, is entitled to indemnification from the other.

This finding of equal negligence is, like the district court's finding of proximate cause and negligence generally, subject to a "clearly erroneous" standard of review. *Knotts,* 893 F.2d at 763. The district court heard testimony about the conduct of Sea–Land and San Miguel in performing the tasks necessary to secure the truck for shipment from which it could reach its conclusion of no indemnity, and this conclusion was not clearly erroneous.

## III. CONCLUSION

Because stowage of the truck on deck was a material deviation from the terms of the contract of carriage and because Sea–Land was not entitled to indemnity from San Miguel, we affirm those portions of the district court's judgment awarding damages in excess of the COGSA limitation of liability and apportioning damages equally between Sea–Land and San Miguel. We reverse the entry of judgment against Sea–Land and San Miguel jointly and severally in the amount of $70,706.43 and remand for the entry of judgment against Sea–Land

and San Miguel jointly and severally in the amount of $30,706.43, together with pre-judgment interest from November 1, 1988 until April 10, 1990 and all costs of the proceedings in the district court.[14] Each party shall bear its own costs.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**14.** The award of prejudgment interest and costs was not appealed, so we do not disturb it.